IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CR-308 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| STUART PFLAUM, | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, Carole S.

Rendon, Acting United States Attorney, and Margaret A. Sweeney and Michelle M. Baeppler,

Assistant United States Attorneys, and hereby files this Sentencing Memorandum.

I.      **Factual and Procedural Background**

Stuart Pflaum was part of the managerial team that led a cross-country drug trafficking

organization (DTO) and money laundering organization (MLO) between 2013 and 2015.  James

Sorgi was the head of the organization, which grew high-grade marijuana in California and

shipped it to the Cleveland, Ohio, area for distribution.  Stuart Pflaum was involved in the

organization very early, living with Sorgi in California in late-summer, early-fall 2013 growing

marijuana, packaging and shipping the marijuana back to the Northern District of Ohio (NDOH).

During this time, Sorgi was receiving his marijuana through Lavivian Wright in California.

Sorgi shipped the marijuana to the NDOH through various means including mailing the marijuana through the United States Postal Service (USPS) and driving the marijuana from California to Cleveland.  Sorgi and other members of his organization who were based in California mailed the marijuana packages to various addresses in the NDOH, and others involved in the conspiracy were responsible for receiving the packages when they arrived, including Wendi Vicory, Joshua Watkins, and Fred Bagi.

While Stuart Pflaum was living in California with James Sorgi, Robert Serina was responsible for collecting the marijuana proceeds in the NDOH.  After that, various members of the organization would launder the money back to James Sorgi, concealing that the source of the money was marijuana sales and James Sorgi was the owner of the same.  More specifically, Fred Bagi, Joshua Watkins, and Wendi Vicory deposited money into various funnel accounts in the NDOH so that members of the organization in California could withdraw the money and give it to James Sorgi.

In 2014, Robert Serina was no longer involved in Sorgi's organization.  Shortly thereafter, Stuart Pflaum became the local director of Sorgi's organization in Cleveland, and his leadership role was directly below James Sorgi.  As the local leader of the organization, Pflaum was responsible for managing the money and supervising Sorgi's operation in Cleveland. Indeed, Pflaum was involved in every aspect of the organization's laundering methods.  Pflaum was responsible for collecting the money, distributing the money to the organization's stash houses, and instructing others to launder the money on behalf of the organization.  After collecting the marijuana proceeds from the distributors, Pflaum took some of the money and stored it at various stash houses, including Joshua Watkins' residence.  Pflaum would also return to these stash locations to collect the money when it was time to get the money back to Sorgi in

California.  On some occasions, Pflaum drove marijuana proceeds back to Sorgi in California. Pflaum also instructed others, including Craig Kavak, to open bank accounts for the purpose of funneling marijuana proceeds from the NDOH to Sorgi in California.  Pflaum also personally laundered marijuana proceeds for the organization through his own Chase Bank account.  Pflaum personally funneled approximately $45,000 through his Chase Bank account.

Stuart Pflaum also provided marijuana proceeds to Ryan Rodriguez and instructed him to purchase money orders and mail them to California.  Stuart Pflaum provided the money from the marijuana sales to Rodriguez and instructed him to convert the cash into money orders.  Pflaum paid Rodriguez to purchase and mail money orders on behalf of the Sorgi MLO.  Stuart Pflaum also gave Rodriguez amounts, payee names, and addresses for Rodriguez to use when he purchased the money orders.  At Stuart Pflaum's direction, Rodriguez converted the marijuana proceeds into money orders by going to various locations so as not to raise law enforcement suspicion. Again at Pflaum's direction, Rodriguez purchased money orders in amounts less than $2,500 each to avoid providing his identification during the purchases.  Pflaum directed Rodriguez to mail the money orders via the United States Mail to members of the Sorgi MLO in California.  He gave Rodriguez instructions as to where to mail the money orders including the names and addresses to place on the packages.  More specifically, on or about February 2014 through on or about June 2014, Stuart Pflaum provided Ryan Rodriguez between $10,000 and $15,000 of marijuana proceeds at least twice each week and instructed Rodriguez to convert the proceeds to money orders and mail the money orders to members of the SORGI MLO in California. Based on these numbers, Stuart Pflaum provided Ryan Rodriguez approximately $400,000 to $600,000 between February and June 2014.

In total, the entire organization laundered over approximately $1,000,000 of marijuana proceeds through these various means.  Based on the number of parcels that the Postal Inspectors have connected to this organization sent from California to Cleveland, a conservative estimate of the amount of marijuana that this organization distributed is in excess of 700 pounds.

In February 2015, law enforcement approached several members of the organization in California and Ohio.  At this time, several of the co-conspirators spoke with investigators, and many of them pleaded guilty by way of information, including Wendi Vicory, Joshua Watkins, Ryan Rodriguez, Lavivian Wright, and Fred Bagi.

In May 2015, the government learned that Stuart Pflaum was preparing to leave the country and move to Belize.  On May 25, 2015, Stuart Pflaum was charged by complaint.  He was subsequently indicted for conspiracy to launder money.  A superseding indictment followed.

## II.    Law and Argument

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Appellate courts must review a district court's sentence for procedural and substantive reasonableness.  *Id.* at 51.  Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range.  *Id.*

### A.    Advisory Guidelines Calculation

The government does not object to the final presentence report issued April 27, 2016.  (R. 178:  Pflaum, PSR, PageID 770-96).  The following is the government's position as to the correct Guidelines calculation applicable to Defendant:

4

| Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h) | | |
|---|---|---|
| Base Offense Level | 8 +14 | § 2S1.1(a)(2) |
| Specific Offense Characteristic: Drug Proceeds | +6 | § 2S1.1(b)(1) |
| Specific Offense Characteristic: § 1956 Conviction | +2 | § 2S1.1(b)(2)(B) |
| Role: Manager/Supervisor | +3 | § 3B1.1(b) |
| **Total Offense Level before Acceptance of Responsibility** | **33** | |

Pursuant to U.S.S.G. §2S1.1, Defendant's base offense level begins at 8 and then increases based on the value of the laundered funds.  U.S.S.G. § 2S1.1(a)(2).  "'Laundered funds' means the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission involved in violation of 18 U.S.C. § 1956[.]"  *Id.* at n.1.  Here, the Sorgi MLO laundered approximately $1,500,000.  This figure is based on information that the government has learned from cooperators who were involved in the organization, as well as USPS records which show the packages that members of the Sorgi DTO sent from California to Cleveland.  Based on this number, 14 levels are added to Defendant's base offense level, resulting in a total base offense level of 22.

Additionally, a 6-level enhancement applies pursuant to §2S1.1(b)(1) because Defendant knew that the laundered funds were the proceeds of or intended to promote "an offense involving the manufacture, importation, or distribution of a controlled substance," specifically, the distribution of marijuana.  U.S.S.G. § 2S1.1(b)(1)(A)(B)(i).  Another 2-level enhancement applies because the Defendant was convicted under 18 U.S.C. § 1956.  U.S.S.G. §2S1.1(b)(2)(B).

The government also agrees with the assessment that Pflaum was a manager or supervisor in the MLO, which involved more than five people; therefore, Pflaum is subject to a 3-level enhancement.  U.S.S.G. § 3B1.1(b).

Accordingly, Pflaum's total adjusted offense level, prior to any considering for Plaum's acceptance of responsibility, is 33.

1.    *Loss enhancement*

Stuart Pflaum should be held accountable for the entire amount of money laundered by the James Sorgi MLO because the total funds laundered was part of the agreement between Sorgi and Pflaum and because it was reasonably foreseeable to Pflaum that the Sorgi MLO laundered approximately $1,5000,000.  Pursuant to U.S.S.G. § 1.B1.2, when calculating the Defendant's base offense level, this Court should consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[,] and in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were within the scope of the jointly undertaken criminal activity, in furtherance of the criminal activity, and reasonably foreseeable within that criminal activity that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  §1B1.3(a)(1).  In making this determination, the Court may consider any explicit or implicit agreement fairly inferred from the conduct of the defendant and others.  *United States v. Nazzal*, 607 F. App'x 451, 460 (6th Cir. 2015) (quoting *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002)).

First, the Court must determine whether the conduct was in furtherance of the jointly undertaken criminal activity.  *See Campbell*, 279 F.3d at 400.  Here, Stuart Pflaum agreed to assist James Sorgi in operating a cross-country drug trafficking organization, and Pflaum agreed to help Sorgi launder the proceeds of those drug sales back to Sorgi in California.  Pflaum was involved in every aspect of Sorgi's money laundering organization.  Indeed, laundering the drug proceeds *was* the jointly undertaken activity agreed to between Pflaum and Sorgi.  In support of this agreement Stuart Pflaum personally committed several acts in further of this agreement, including:  collecting marijuana proceeds in the NDOH; driving marijuana proceeds to Sorgi in

California; storing marijuana proceeds at his house; driving marijuana proceeds to other stash houses; using his own bank account to funnel money back to Sorgi in California; instructing other persons to open bank accounts that would be used to funnel money; and supervising another member of the organization to convert the marijuana proceeds into money orders and ship them to California.  Pflaum was someone who participated in each money laundering method of the Sorgi MLO—driving money, funneling money, storing money, and converting money into money orders.  As such, the acts of other persons in the conspiracy who laundered money through the same methods were also in furtherance of that same jointly undertaken criminal activity (i.e. laundering the proceeds of marijuana sales on behalf of James Sorgi) and, therefore, the acts of those persons are directly attributable to Pflaum.

Second, the Court must find that the jointly undertaken conduct was reasonably foreseeable to the Defendant in connection with the criminal activity.  *Id.*  Stuart Pflaum held a unique position in the Sorgi MLO.  He was a trusted, high-ranking member of the organization who was involved in drug trafficking aspect of the organization, as well as the various money laundering methods.  More specifically, Pflaum was involved in transporting the marijuana from California to the NDOH and, consequently, knew that the proceeds from the sale of that marijuana would be laundered back to Sorgi in California.  Consequently, the laundering of those proceeds was more than reasonably foreseeable to Pflaum as part of his agreement with Sorgi— indeed, it was the intended goal of the jointly undertaken activity.  Because Pflaum agreed to launder the proceeds of the marijuana sales for James Sorgi, and because Pflaum was involved in every aspect of the organization, from the drug trafficking to the various laundering methods, this Court may hold Pflaum responsible for the entire amount of money laundered by the Sorgi MLO.  *See, e.g.*, *Nazzal*, 601 F. App'x at 460 ("The district court . . . properly attributed all [the

bank's] losses to both [defendants] because the losses were procured as part of the overarching conspiracy.").

        2.      *Role enhancement*

      Stuart Pflaum was a manager or supervisor in the James Sorgi MLO and, therefore, a 3-level aggravating role enhancement should apply.  "If the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive," a three-level enhancement applies to the defendant's guideline calculation.  U.S.S.G. §3B1.1(b).  This enhancement includes two considerations, (1) the size of the criminal activity, and (2) the defendant's role in the activity.  *Id.*  First, the criminal activity involved in this case involved five or more persons.  The Sorgi DTO/MLO was a widespread, cross-country organization that included dozens of participants; nine of those participants were charged as co-defendants in the superseding indictment, and an additional five others were charged in separate informations related to this case.  Additionally, this organization employed dozens of additional persons in California and Ohio who participated in the underlying marijuana trafficking and assisted in the growing, shipping, receiving, and distribution of the Sorgi DTO's marijuana.  Many of these persons were not charged either because of the scope of their involvement or because of the quality of the evidence against them; but these persons were nevertheless clearly involved in the same funneling activity as Pflaum, Sorgi, and others.

      Moreover, Stuart Pflaum actively managed and supervised others as part of his role in this conspiracy.  "To qualify for an adjustment under [§3B1.1], the defendant must have been the organizer, manager, or supervisor of one or more other participants."  U.S.S.G. §3B1.1 n. 2.  Stuart Pflaum managed several persons as part of his leadership role in the Sorgi DTO/MLO,

instructing them on how to launder the organization's marijuana proceeds and providing the proceeds for his co-conspirators to launder.

First, Pflaum was a manager/supervisor of Ryan Rodriguez's money laundering activity. Pflaum provided marijuana proceeds to Rodriguez and instructed him to purchase money orders and mail them to California.  Pflaum paid Rodriguez to purchase and mail money orders on behalf of the SORGI MLO.  Pflaum also gave Rodriguez amounts, payee names, and addresses for Rodriguez to use when he purchased the money orders.  At Stuart Pflaum's direction, Rodriguez converted the marijuana proceeds into money orders by going to various locations so as not to raise law enforcement suspicion. Again at Stuart Pflaum's direction, Rodriguez purchased money orders in amounts less than $2,500 each to avoid providing his identification during the purchases.  Pflaum also directed Ryan Rodriguez to mail the money orders via the United States Mail to members of the SORGI MLO in California.  Pflaum gave Rodriguez instructions as to where to mail the money orders including the names and addresses to place on the packages.  More specifically, on or about February 2014 through on or about June 2014, Stuart Pflaum provided Ryan Rodriguez between $10,000 and $15,000 of marijuana proceeds at least twice each week and instructed Rodriguez to convert the proceeds to money orders and mail the money orders to members of the SORGI MLO in California.  Based on these numbers, Stuart Pflaum provided Ryan Rodriguez approximately $400,000 to $600,000 between February and June 2014.

Second, Pflaum was responsible for collecting marijuana proceeds, distributing marijuana proceeds to the organization's stash houses, and instructing others to launder money on behalf of the organization.  After collecting the marijuana proceeds from the distributors, Pflaum took some of the money and stored it at various stash houses, including Joshua Watkins' residence.

Pflaum would also return to these stash locations to collect the marijuana proceeds when it was time to get the money back to Sorgi in California.

Third, Pflaum also instructed Craig Kavak, to open bank accounts for the purpose of funneling marijuana proceeds from the NDOH to Sorgi in California.  Telephone calls between Stuart Pflaum and Craig Kavak intercepted during the course of a court-authorized wiretap on Kavak's phone support that Pflaum instructed Kavak.  For example, on June 3, 2014, at approximately 11:11 a.m., Stuart Pflaum and Craig Kavak had a conversation on the telephone wherein Pflaum instructed Kavak that they would be going to a bank in another state to funnel money on behalf of the Sorgi MLO.  During the conversation, Pflaum told Kavak, "So, we're going on a little road trip today, buddy."  Kavak replied, "Oh, that's good.  Just what's our time window, 'cause I want to have everything mapped out over here."  After discussing where Kavak was at the time, Pflaum stated, "Okay, ah, perfect, alright, well, I'm heading back to my place and then I'm going to leave there, ah, pretty much immediately and come swoop you.  Ah, and then it will be three hours, probably, and change since we're going to go a little further, ah, than usual, three hours and change there, three hours and change back, so probably seven hours round trip.  Just in driving and then figure another like half hour to forty-five minutes while you are in there."  Kavak responded, "Alright . . . a little bit at all, let me know if there is, that one, like two and a half hours away, right?"  Pflaum responded, "He doesn't want us to use the one, that, that's been blown up."  Kavak stated, "That's fine."  Pflaum stated, "By everyone, so we got to go over into that next state, it's only like fifteen minutes from the other one."  Kavak stated, "Oh, that's fine.  So what do I need, just my ID?"  Pflaum stated, "Ah, yeah, your ID, ah, I don't know.  When was the last time you opened up a bank account?"  Kavak stated, "When do you think?"  Pflaum stated, "Yeah, just whatever you have then."  Kavak stated, "New York is just an ID.  Is

there any chance you can call the exact branch and double check, just uh, just so we don't go all the way out there and look stupid." Pflaum stated, "Just call, and, 'cause he just did it with someone else." Kavak stated, "Just ask him?" Pflaum stated, "Yeah, and verify that's all you would need.  I can't imagine you would need anything else." Kavak stated, "I didn't think so either but, I didn't want to get all the way there and then have him be like, 'You two are at it again.'"

Additionally, on June 4, 2014, at approximately 9:29 p.m., Stuart Pflaum called Craig Kavak on the telephone and had a conversation.  Pflaum instructed Kavak, "Uh, you better set your alarm clock." Kavak asked, "Why?" Pflaum responded, "Uh, somebody's getting a new bank account before they get on the plane tomorrow." Kavak stated, "Alright." Pflaum stated, "Um . . . where you be, I have get up bout eight-thirty to take you up to US Bank. . . . Where you goin' be at, I got to pick you up about eight-thirty and take you over to US Bank." Kavak responded, "My brother's. Same place." Later in the conversation, Pflaum stated, "Uh yea, so pretty sure we are going to have to straight from the bank to-to the airport." Kavak replied, "Yea, basically." Pflaum again instructed Kavak, "Have all your shit ready to go just in case dude. There is a chance we might be going straight from the bank to the airport." Kavak stated, "Understood."

The next day, on June 5, 2014, at approximately 8:31 a.m., Stuart Pflaum called Craig Kavak on the telephone.  Kavak answered and Pflaum stated, "You up?" Kavak stated, "Oh, yeah." Pflaum stated, "Alright, I'll be there in like probably 15 minutes." Kavak stated, "Bullshit, you're gonna come inside and take a dab." Pflaum responded, "Fuck, fuck no I'm not. We are working today, son." Kavak responded, "Okay.  Alright." Pflaum stated, "Be ready to go and say your final good byes there buddy.  It's the last time you're ever gonna see any of

'em."  At approximately 9:15 a.m., Craig Kavak called Stuart Pflaum on the telephone.  Kavak stated, "Hey can you try and figure out what plane I'm on and my, my flight information?"  Pflaum stated, "Yeah, I just tried calling him (Sorgi) actually.  I have a text from him last night, uh, from when he was trying to call me, like, like, late at night saying, 'Call me ASAP.  Emergency.'  So I'm, I'm still waiting here.  But soon as I hear from him I'll let you know."  Kavak responded, "Oh great!"  Pflaum stated, "I don't know.  It didn't say, it didn't say don't need anything in the morning so fucking proceed as plan."  Kavak stated, "Alright."  At approximately 9:33 a.m., Craig Kavak called Stuart Pflaum on the telephone.  Kavak asked Pflaum where he was at in the store because he was done opening the bank account.

Although Pflaum's management and direction of other members of the organization was done at the behest of James Sorgi, he was nevertheless in such a position to give those instructions because he was a trusted member of Sorgi's organization to whom Sorgi delegated leadership responsibilities.  During the time of the conspiracy when Pflaum was in Cleveland managing the organization's assets and instructing other members how to launder the organization's money, there was no one else in Cleveland comparable to Stuart Pflaum.  Rather, during this time, Pflaum was the only person in Cleveland dolling out orders to other members of the organization on behalf of James Sorgi, and Pflaum was the only person in Cleveland who was responsible for supervising the conversion of marijuana proceeds into money orders by Ryan Rodriguez.  Accordingly, this Court may apply an additional 3 levels to Pflaum's Guidelines calculation because he was manager and/or supervisor.

      B.      Title 18, United States Code, Section 3553(a) Factors

A sentence within the advisory guideline range is appropriate and sufficient but not greater than necessary to comply with the § 3553(a) factors.  Pursuant to 18 U.S.C. § 3553(a):

The court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence, and the sentencing range . . . ;
(5) any pertinent policy statement . . . ;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . .

18 U.S.C. § 3553(a).

First, the nature and circumstances of the offense support a sentence within the advisory guidelines range.  This was a sophisticated, wide-spread, long-term criminal enterprise that operated across the country, and Stuart Pflaum's participation in the organization was extensive. Pflaum was involved in nearly every aspect of Sorgi's organization including growing the marijuana in California and packaging it for distribution, driving marijuana from California to Ohio, and managing the marijuana proceeds in Ohio and ensuring that they were laundered back to James Sorgi in California.  Indeed, Pflaum himself refers to Jamie Sorgi as his "business partner."  (*See* R. 178: Pflaum PSR, ¶27, PageID 779)  Moreover, Pflaum's participation in the conspiracy was not short-lived.  Pflaum willingly chose to stay an active participant in the organization and gained more responsibility along the way.  By the end of the conspiracy, Stuart Pflaum was the director of the organization in Cleveland.  He was responsible for making sure the money was accounted for, and he was entrusted with making sure it was laundered back to Sorgi in California.  Defendant's background and characteristics made him well-suited for this position in Sorgi's organization.  Pflaum is well-educated and, by his own description, he once

had a "prosperous career" in the music industry.  (*Id.* at PageID 778).  He is someone who had the opportunity and the ability to succeed in a legitimate business setting, but chose to abandon those opportunities in exchange for an easier and more lucrative position in James Sorgi's drug trafficking and money laundering organization.

Moreover, a sentence within the advisory guideline range reflects the seriousness of the offense.  The Sorgi DTO/MLO was responsible for distributing hundreds of pounds of marijuana throughout the Northern District of Ohio and laundering more than one million dollars made from the sale of that marijuana over a period of several years.  In order to launder such a significant amount of money, Stuart Pflaum and other members of the organization used financial institutions and the USPS to launder the proceeds of the organization's drug trafficking.  This activity continued for over a year, operating across the country from California to Ohio.  Despite law enforcement seizing several packages during the course of this conspiracy, Stuart Pflaum, James Sorgi, and other members of the organization continued on unfazed, reaping the financial benefits of their well-organized operation.  Simply stated, from a cost-benefit analysis, growing and selling marijuana was so lucrative, that suffering the monetary loss of a few unaccounted-for boxes here and there was well worth it.  This organization, including Stuart Pflaum, operated for the sole purpose of profit.  Accordingly, a sentence within the advisory guideline satisfies the factors set forth in 18 U.S.C. § 3553(a) and is sufficient but not greater than necessary.

## III.    CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence within the advisory guidelines range as outlined in this memorandum.

Respectfully submitted,

CAROLE S. RENDON
Acting United States Attorney

By:    /s/ Margaret A. Sweeney
Margaret A. Sweeney (OH: 0086591)
Michelle M. Baeppler (OH: 0065378)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3990/3995
(216) 522-7499 (facsimile)
Margaret.Sweeney@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of May 2016 a copy of the foregoing Sentencing Memorandum was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Margaret A. Sweeney
Margaret A. Sweeney
Michelle M. Baeppler
Assistant U.S. Attorney